# In the United States Court of Federal Claims

No. 23-1392

Filed: December 14, 2023†

**LS3, LLC,**

    *Plaintiff*,

v.

**THE UNITED STATES,**

    *Defendant*,

and

**NEW DIRECTION TECHNOLOGIES, INC.,**

    *Intervenor-Defendant.*

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington D.C., with *Thomas A. Pettit*, Of Counsel, for LS3, LLC.

*Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, Civil Division, *Corinne A. Niosi*, Assistant Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, D.C. with *Brandon Barros*, Naval Air Warfare Center Weapons Division, Office of General Counsel, U.S. Navy, and *Michael Blumenthal*, Office of Litigation, U.S. Small Business Administration, Of Counsel, for the United States.

*Ambika K. Biggs*, Hirschler Fleischer, Tysons, VA, with *William L. Walsh* and *Allison Klena*, Hirschler Fleischer, Tysons, VA, and *Andrea M. Marafatsos*, Hirschler Fleischer, Richmond, VA, Of Counsel, for New Directions Technologies, Inc.

---

† This Opinion was originally filed under seal on November 30, 2023, (ECF No. 33). The Court provided parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions. In a Joint Status Report filed December 14, (ECF No. 35), the parties indicated that no redactions were required.

## **MEMORANDUM OPINION AND ORDER**[1]

**TAPP, Judge.**

"Take the words for what they are."[2] This is particularly true in terms of contract design and compliance with federal regulations. Here, Plaintiff LS3, LLC ("LS3"), challenges a U.S. Small Business Administration ("SBA") determination that LS3 does not qualify as a service-disabled, veteran-owned small business ("SDVOSB") joint venture. For what ultimately amounts to inartful drafting, LS3 fails to demonstrate that the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Plaintiff's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 20-1), is denied.[3] The United States and Intervenor-Defendant's Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 22; Int.-Def.'s xMJAR, ECF No. 21), are granted.

### I. Background

*A. The Formation of LS3 and the Procurement*

This protest concerns the formation of LS3, a mentor-protégé joint venture formed by LUKAYVA—the protégé and SDVOSB—and its mentor, Systems Application & Technologies, Inc. ("SA-TECH"). (*See generally* Compl., ECF No. 1). SA-TECH services government and commercial entities in matters of operations and maintenance, engineering, information technologies, and logistics support services. (Pl.'s MJAR at 9, ECF No. 20-1 (citing *Who We Are*, SA-TECH, https://www.sa-techinc.com/who-we-are/ (last visited Nov. 21, 2023))). In 2016, Mr. Wade VanDerWerff ("Mr. VanDerWerff") began employment at SA-TECH as a program manager. (Administrative Record ("AR ___") at 3132, 3135, ECF No. 19). In that role, Mr. VanDerWerff "supports SA-TECH's Advanced Technology Test Team contract to support test and evaluation services for the U.S. Navy and other [Department of Defense] organizations." (AR 3135).

While still serving as an SA-TECH program manager, Mr. VanDerWerff assembled LUKAYVA, an entrepreneurship specializing in U.S. Navy Aerial Target System operations through "aerial system preparation, training/post-training support, operations and maintenance, engineering, logistics, and aerial asset recovery." (AR 2932 (Articles of Incorporation), 3133; *see also* Pl.'s MJAR at 9 (citing *About Us*, LUKAYVA, https://lukayva.com/ (last visited Nov. 21, 2023)). The Department of Veterans Affairs ("VA") Center for Verification and Evaluation verified that LUKAYVA qualified as an SDVOSB that December. (AR 3076–77).

---

[1] This Memorandum Opinion and Order was prefaced by an Order indicating the Court's ruling on November 15, 2023. (ECF No. 28). This Opinion reflects the date that judgment is ordered to be entered.

[2] T. Swift, *Illicit Affairs* (Folklore), (Republic, 2020).

[3] LS3's supporting memorandum is docketed as ECF No. 20-1. All citations to its Motion for Judgment on the Administrative Record refer to its supporting memorandum.

Planning to bid on government contracts and competing for subcontracts, Mr. VanDerWerff "realized the significant barriers to entry in the government contracts marketplace" and approached Mr. Geoff DeZavala ("Mr. DeZavala"), Chief Operating Officer ("COO") and Senior Vice President of SA-TECH, for clarity and direction. (AR 3133, 3136). LUKAYVA and SA-TECH executed a mentor-protégé agreement, (AR 3000–08), and subsequently obtained SBA's approval. (AR 3009–11). LUKAYVA and SA-TECH then formed a joint venture, LS3. (AR 3013, 3037). Because of LUKAYVA's status as an SDVOSB, the joint venture sought to obtain the same status for LS3. 13 C.F.R. § 125.9(d)(1). One feature of this specific program is that it allows the protégé and mentor to "joint venture as a small business for any government prime contract, subcontract or sale, provided the protégé qualifies as small for the procurement or sale." *Id.* The "joint venture may seek any type of small business contract . . . for which the protégé firm qualifies . . . ." *Id.* To qualify for these benefits, joint venture agreements must contain certain provisions specified in SBA regulations; 13 C.F.R. § 125.18(b) dictates requirements for SDVOSB joint venture agreements in effect at the time LS3 submitted its proposal.

This dispute arises from a 2022 Naval Air Warfare Center Weapons Division ("the Navy") solicitation for Engineering Support Services ("ESS VII") contract (the "Contract").[4] (*See* Compl. at 13; AR 201). The purpose of the ESS VII contract was to "provide weapons systems effectiveness analysis, design adequacy studies and evaluations, test and evaluation support, general engineering and related documentation" for weapons-related projects supported at China Lake and Point Mugu, California, and other locations set forth in individual task orders. (AR 914–15 (citing Statement of Work)). The approximately 41.5-million-dollar solicitation was set aside for SDVOSBs. (Compl. at 13). LS3 submitted its proposal and was the apparent successful offeror; thus, the Navy notified the other two offerors that their offers were rejected. (AR 2871, 620). In response, the unsuccessful offerors formally disputed LS3's qualifications as to its size and status before the SBA. (AR 1–3, 866–76).

B. *Protests before the SBA*

Defendant-intervenor, New Directions Technologies, Inc. ("NDTI"), filed a combined size and status protest, arguing that LS3 was "other than small" and thus ineligible to compete for the ES VII Contract. (AR 866–76). Another offeror, Synectic Solutions, Inc. ("SSI"), also filed a size protest with SBA against LS3. (AR 1–3). Under the established SBA system, the SBA Office of Government Contract Area Office—here, Area VI (the "Area Office")—exercised jurisdiction over the size protests only and issued two size determinations (one for each protest). Per 13 C.F.R. § 134.1004, the SBA Office of Hearings and Appeals ("OHA") exercised jurisdiction over NDTI's protest challenging LS3's SDVOSB status.[5] (AR 2881–84).

Relevant to the status protest, OHA ordered LS3 to produce a series of documents—namely, incorporation documents for LUKAYVA and SA-TECH, including "Bylaws, Articles of

---

[4] Request for Proposals Number N6893620R0120 (the "Solicitation").

[5] Docketed as VSBC-2023-04-04-192. (AR 2881–84).

Incorporation/Organization[;]" LS3's Operating Agreement ("JVOA"); and the Joint Venture Agreement ("JVA") between LUKAYVA and SA-Tech as of the date LS3 submitted its final proposal revisions. (AR 2903–04; 2927–30 (LS3 compliance)). LS3 represented "[t]he Operating Agreement . . . governs the parties' rights and responsibilities." (AR 2928). After reviewing LS3's case file, NDTI submitted a supplemental protest arguing that "the mentor, SA-TECH, has negative control of the joint venture in violation of 13 C.F.R. § 125.18(b)(2)(ii)(A)." (AR 3337–52).

In the interim of the status protest, the Area Office issued determinations in both SSI's and NDTI's size protests on May 8, 2023. (AR 2380–98, 2399–420). The Area Office determined in both instances that LS3 did not qualify as small because the LS3 JVA did not comply with "Responsible Manager" requirements due to Mr. VanDerWerff's ongoing employment with SA-TECH. (AR 2380–420). LS3 appealed the size determinations to OHA, (AR 2421–41), arguing that the Area Office's determinations contravened the record and the plain language of 13 C.F.R. § 125.18(b)(2)(ii). This put both the NDTI status protest and the size protests before OHA. 13 C.F.R. § 134.1004

On August 9, 2023, OHA granted the status protest in favor of NDTI, finding that LS3 failed to establish that it was an eligible SDVOSB joint venture for the relevant procurement because of the negative control SA-TECH had over day-to-day functions of contract performance. (AR 3403). The violated regulation provides that the "managing venturer is responsible for controlling the day-to-day management and administration of the contractual performance of the joint venture, but other partners to the joint venture may participate in all corporate governance activities and decisions of the joint venture as is commercially customary." 13 C.F.R. § 125.18(b)(2)(ii)).

The JVOA generally provides that the business and affairs of LS3 were to be managed by and under the direction and control of the "Management Committee"—an entity comprised of two members from protégé LUKAYVA and mentor SA-TECH. (AR 3402, 3021–22). The Management Committee manages all LS3's "businesses and affairs," except for "those matters expressly specified by this [JVOA] to be managed by the Managing Member or subject to the unanimous approval of the Members." (AR 3021–22). Other than such matters, "[t]he Management Committee shall have exclusive power and authority to manage the business and affairs of the Company, including in performing the Contract." (*Id.*). The JVOA importantly goes on to say that the project manager, Mr. VanDerWerff, is "subject to the direction and control of the Management Committee," and must "carry out the policy decisions of the Management Committee." (AR 3023). OHA effectively found that the Agreements painted the role of the Management Committee too broadly.

For OHA, these provisions stripped the Managing Venturer, LUKAYVA, of its requisite power, as it cannot "independently control" contract administration matters. (*See* AR 3402). Considering the above-relayed provisions, OHA found that "LS3's Management Committee has control over the project management, and consequently, the mentor firm, SA-TECH, has negative control over the Management Committee, when it can block any action by the LUKAYVA members by causing a tie vote and/or denying a majority." (*Id.*). OHA rejected LS3's argument that SA-TECH's role was limited to participation in customary corporate governance. (AR 3403 ("This goes beyond mere participation in corporate governance.")).

As to the merits of the size protests, OHA disagreed with the Area Office findings and held that Mr. VanDerWerff *could* serve as the Responsible Manager despite his SA-TECH employment. (AR 3401 ("Mr. VanDerWerff is an employee of LUKAYVA; indeed, he is the principal of LUKAYVA, which appears to meet the regulatory requirement. That his title is not Responsible Manager is irrelevant.")). Despite this finding, OHA dismissed the size appeal as moot because LS3 had otherwise "been found ineligible for the subject procurement." (AR 2680–85). Disagreeing with the entirety of OHA's findings and their administrative processes in dismissing the size appeal as moot, this litigation ensued.

## II.    Analysis

As stated, OHA held that LS3 does not qualify as an SDVOSB joint venture because the operating documents violate 13 C.F.R. § 125.18(b)(2)(ii)(A). (AR 3402–03). OHA premised this determination on its conclusions that: (1) the JVOA establishes a Management Committee; (2) the Management Committee has plenary power over LS3 operations; (3) Management Committee Actions require a majority vote of the Managers; and (4) SA-TECH and LUKAYVA have equal representation, providing SA-TECH with the ability to block any Management Committee actions. (*See* AR 3394–403). LS3 argues that this conclusion contravenes the evidence. (*See generally* Pl.'s MJAR). The United States and awardee, NDTI, disagree and argue that the Court should affirm OHA's findings as being reasonable and in accordance with law. (*See generally* Def.'s xMJAR; Int.-Def.'s xMJAR). Finding that OHA's findings were either non-prejudicial or not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the Court affirms the OHA decision. *See* 5 U.S.C. § 706(a)(2).

### A.  Jurisdiction

The Tucker Act provides that an interested party may file an action in the Court of Federal Claims "objecting [(1)] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [(2)] to a proposed award or [(3)] the award of a contract or [(4)] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'"). "[C]hallenges to decisions by the OHA fall within the scope of jurisdiction granted under the Tucker Act because such challenges are actions in connection with a proposed procurement." *Palladian Partners v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015); *see also 22nd Century Techs., Inc. v. United States*, 57 F.4th 993, 999 (Fed. Cir. 2023) ("Where an SBA decision is made 'in connection with a proposed procurement,' the Claims Court would normally have jurisdiction to review that decision under § 1491(b)(1)." (internal citations omitted)).[6]

---

[6] Standing is an integral part of jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, (1992). Here, the United States does not challenge standing. Further, LS3 was the presumptive awardee of the underlying procurement prior to OHA's rulings; by virtue of this, the Court finds that LS3 has established standing.

*B. Standard of Review: The APA Standard Applies*

All parties move for judgment on the Administrative Record. *See* RCFC 52.1. Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry focuses on whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

According to 28 U.S.C. § 1491(b)(4), the Court typically reviews agency procurement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). Thus, judicial review of agency action under the APA proceeds on two tracks: the Court could find (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). To obtain relief, after showing that the procuring agency violated the law or acted arbitrarily and capriciously, the protestor must also show that the agency's violation was prejudicial to the protestor. *Glenn Def. Marine*, 720 F.3d at 907.

"Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). The Court may not substitute its own judgment for that of the agency. *Id*. But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Out of the starting gate, the parties dispute whether OHA is entitled to deference in this instance. LS3 argues that OHA's decision "does not merit deference," because this case involves questions of contract interpretation and "does not involve discretionary agency judgments." (Pl.'s MJAR at 18). As LS3 characterizes it, the questions before the Court are limited to whether "the LS3 JVOA and JVA provide LUKAYVA with control over the day-to-day management and administration of the contractual performance of the joint venture," and whether "OHA should have reversed the Area Office size determinations" as opposed to dismissing as moot. (Pl.'s MJAR at 8).[7] Conversely, the United States and NDTI urge the Court to utilize the typical APA standard. (*See generally* Def.'s xMJAR; Int-Def.'s MJAR).

Decisions disseminated by the SBA are unique, largely because it is rarely the agency driving the procurement. A long line of cases iterates that "OHA's decisions are entitled to

---

[7] The United States correctly notes that LS3's JVA and JVOA include a provision choosing Maryland as the state law governing the document. (Def.'s xMJAR at 22 (citing AR 3034)).

deference due to the SBA's quasi-technical administrative expertise and familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme." *Obsidian Sols. Grp. v. United States*, 153 Fed. Cl. 334, 341–42 (2021); *Darton Innovative Techs., Inc. v. United States*, 153 Fed. Cl. 440, 451 (2021); *Ceres Env't Servs., Inc. v. United States*, 52 Fed. Cl. 23, 33 (2002) ("Unless the plaintiff can show that the OHA acted in violation of an unambiguous statutory or regulatory requirement, special deference is appropriate."). In those instances, "[r]eversal is limited to those situations where OHA has acted irrationally or has erroneously applied relevant procurement law." *Team Waste Gulf Coast, LLC v. United States*, 135 Fed. Cl. 683, 687 (2018) (citing *Eagle Design & Mgmt., Inc. v. United States*, 57 Fed. Cl. 271, 273 (2002)). If OHA has acted rationally, the Court must defer to OHA's decision. *See LB & B Assocs., Inc. v. United States*, 68 Fed. Cl. 765, 771 (2005) (quoting *Ceres Envt'l Servs., Inc.*, 52 Fed. Cl. at 33).

A comprehensive analysis determining the appropriate level of deference due to OHA was recently conducted by Judge Solomson. *Def. Integrated Sols., LLC v. United States*, 165 Fed. Cl. 352, 370–72 (2023). In addition to the cases cited above, *Defense Integrated Solutions* considers a progeny of cases holding that, when considering regulations, only after exhausting all "traditional tools" of regulatory interpretation and finding a regulation is "genuinely ambiguous," may courts consider applying what has been termed *Auer* or *Seminole Rock* deference. *Kisor v. Wilkie*, 588 U.S. ___, 139 S. Ct. 2400, 2414–15 (2019) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 & n.9, and discussing *Auer v. Robbins*, 519 U.S. 452, (1997), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, (1945), with other cases).[8]

Judge Solomson concluded that "special deference" is an inaccurate term; instead, deference owed to OHA should resemble either (a) an application of *Auer* or *Seminole Rock* deference where the regulation at issue is "hopelessly ambiguous," or (b) the deference courts give to reasonable and persuasive agency interpretations applying the typical APA standard of review. *Def. Integrated Sols., LLC*, 165 Fed. Cl. at 368 (inner citations omitted). Notably, though, *Defense Integrated Solutions* recognizes first and foremost that *Auer* deference is only appropriate if the regulation at issue is truly ambiguous, after exhausting all tools of interpretation. *Id.* at 369 (citing *Kisor*, 139 S. Ct. at 2415–16). This is distinct in this case. LS3's argument about the level of deference is not grounded in the ambiguity of OHA's regulation. LS3's grievance is not how OHA interpreted the regulation but how OHA construed the evidence before it—namely, the JVOA and JVA. This is a key distinction from *Defense*

---

[8] Under *Auer* or *Seminole Rock* deference, courts must defer to an agency's reasonable interpretation of the agency's own "genuinely ambiguous" regulations. *Auer*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79, *Seminole Rock*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700, and other Supreme Court cases). For a comprehensive analysis of the appropriate deference owed to OHA, *see Def. Integrated Sols., LLC*, 165 Fed. Cl. at 370–72.

*Integrated Solutions* where the issue amounted to OHA allegedly misconstruing the regulation but correctly interpreting the subject contract provisions.

Contract interpretation is a question of law that the Court generally reviews de novo. *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 327 (2012). However, given that this case relates directly to the OHA's factual findings, the Court cannot rest its decision solely on canons of contract interpretation. That is, the JVA and JVOA cannot open and shut this case. The Court must examine whether the terms laid out in the operation documents qualify as day-to-day management and administration of the contractual performance or whether the breadth afforded to the Management Committee usurps the requisite powers of the managing venture; this is a mixed question of law and fact. *See Campbell v. Merit Sys. Prot. Bd.*, 27 F.3d 1560, 1565 (Fed. Cir. 1994). To review mixed questions of law and fact, the Court must determine "whether answering it entails primarily legal or factual work." *Nieves v. Sec'y of Health & Hum. Servs.*, 167 Fed. Cl. 422, 428 (2023) (citing *U.S. Bank Nat. Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Vill. At Lakeridge*, LLC, 138 S. Ct. 960, 967 (2018)); *see also In re Brana*, 51 F.3d 1560, 1568 (Fed. Cir. 1995) ("When these questions of judgment are before us, whether we defer, and the extent to which we defer, turns on the nature of the case and the nature of the judgment."). On this point, OHA's findings were largely factual in nature.

The Court finds that OHA's determination of how the terms of the JVOA and JVA would be executed as they apply to management and contract administration is largely a factual inquiry rather than an interpretation of contractual terms. As it applies to the deference owed to OHA, judicial review of agency factual findings is highly deferential, particularly where technical judgment and expertise are involved. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989). Based on this standard of review, courts generally do not second-guess rational agency factual determinations. Thus, the Court goes forth utilizing the APA standard of review, determining whether the OHA's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial.

C. Discussion

i. OHA did not misconstrue evidence.

LS3 argues that OHA incorrectly invalidated its SDVOSB status because SA-TECH had some level of negative control within the joint venture. (Pl.'s MJAR at 22). Negative control includes instances when minority shareholders can "block action by the board of directors or shareholders." 13 C.F.R. § 121.103(a)(3); *see also* 13 C.F.R. § 125.11. The fact that SA-TECH can exercise some level of negative control is not dispositive, but it is also not LS3's sole hurdle. OHA took issue with the type of negative control SA-TECH could assert via the Management Committee and the *breadth* of activities it could control. LS3 misinterprets OHA's holding.

From the top, to qualify as an eligible SDVOSB, "the management and daily business operations of the concern must be controlled by one or more service-disabled veterans . . . ." 13 C.F.R. § 125.13(a) (2022). "Control by one or more service-disabled veterans means that both the long-term decision[] making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans." *Id*.; *see also* 13 C.F.R. § 125.11 (2022). "Non-service-disabled veteran individuals or entities may not control

8

the firm." 13 C.F.R. § 125.13(i)(1). Applied to the facts here, this means that LUKAYVA needs to be in the driver's seat when it comes to day-to-day management and administration of the business operations.

Two agreements govern LS3's operations as a joint venture—the JVA, (AR 3037–45), and the JVOA, (AR 3013–36; *see also* AR 2928). Every joint venture agreement to perform an SDVO contract must contain a provision designating an SDVOSBC as the managing venturer of the joint venture and designating a named employee of the SDVOSBC managing venturer as the manager with ultimate responsibility for the performance of the contract—also known as a "responsible manager." 13 C.F.R. § 125.18(b)(2)(ii). LS3's JVA identifies LUKAYVA, the SDVOSB and protégé, as the LS3 Managing Venturer.[9] (AR 3037 ("THIS JOINT VENTURE AGREEMENT ('Agreement') is entered into between LUKAYVA, INC. ('LUKAYVA' or the 'Managing Venturer.'")) (capitalization in original), 3038 ("LUKAYVA, the SDVOSB participant, is the Managing Venturer of the Joint Venture.")).

SBA's regulations further dictate that managing venturers be "responsible for controlling the day-to-day management and administration of the contractual performance of the joint venture, but other partners to the joint venture may participate in all corporate governance activities and decisions of the joint venture as is commercially customary." 13 C.F.R. § 125.18(b)(2)(ii)(A). *Defense Integrated Solutions* interpreted this provision in different circumstances, holding that "decisions to file claims, pursue litigation, or settle were not part of SDVOSB's day-to-day management and administration that could not be vetoed[,]" and were therefore "corporate governance activities and decisions" that were commercially customary. 165 Fed. Cl. at 375. Here, OHA's decision did not hinge on an interpretation of what delegated tasks are commercially customary. And there is no argument about OHA's interpretation of "day-to-day management" and "administration of the contractual performance."

In determining whether LUKAYVA was granted its requisite authority, OHA examined the plain language of the JVOA, which incorporates the JVA by reference. (AR 3035). The Agreements define the protégé member LUKAYVA as the "Managing Member" or "Managing Venturer," (AR 3015, 3038), and delegate LUKAYVA various responsibilities, including (1) appointing the Project Manager, (AR 3023), (2) serving as the tax matters partner pursuant to IRS Code Section 6231, (AR 3031), (3) developing the proposal and negotiating the contract, (AR 3033), and (4) making some determinations regarding subcontractors, (AR 3033).

OHA considered the role LUKAYVA carried with the role of the Management Committee. As explained above, the JVOA generally provides that, "the business and affairs of the Company shall be managed by, and under the direction and control of the Management Committee," which, here, is comprised of two members from protégé LUKAYVA and two members from mentor SA-TECH. (AR 3021–22). Article 5.1.1 of the JVOA delineates the Management Committee's authority. (AR 3022). Section 5.1.2, Powers of Management Committee, states that "[d]ecisions of the Management Committee within its scope of authority shall be binding upon the Company, all Managers, the Project Manager, and each Member."

---

[9] The JVOA and JVA use the terms "Managing Member" and "Managing Venturer" interchangeably to define LUKAYVA, (AR 3015, 3307–08).

(*Id.*). The provision states: "Except for those matters expressly specified by this Agreement to be managed by the Managing Member, the Management Committee shall have the exclusive power and authority to manage the business and affairs of the Company, including in performing the Contract."[10] (*Id.*). As mentioned, the JVOA incorporates the JVA. Read together, these Agreements require "unanimous approval of the Members" for certain decisions, including "[a]dmitting new or additional Members," "[w]ithdrawal of a Member," and "[i]nitation of any claim or litigation under the Contract and any final decision to continue prosecution of or settle such litigation or claim[.]" (AR 3023–24).

LS3 reads OHA's holding to say that there can be no level of negative control by a mentor in any aspect of a joint venture. LS3 contorts OHA's finding. It is true that other provisions of SBA regulations allow mentors to exercise negative control over operations other than day-to-day management and contract administration. (Pl.'s MJAR at 22 (citing 13 C.F.R. § 125.18(b)(2)(ii)(A)) ("SA-TECH can exercise negative control (i.e., have veto power) over decisions of the LS3 joint venture so long as LUKAYVA, as the Managing Venturer and Mr. VanDerWerff as the Responsible Manager/Project Manager control the day-to-day administration and management of contract performance.")). However, OHA's decision is specific to SA-TECH's ability to assert negative control in the *day-to-day management* and *administration of the contractual performance* by virtue of its fifty percent representation on the Management Committee. That is, OHA's decision is limited to who can control the breadth of LS3's day-to-day management and administration of contract performance.

OHA's interpretation was not unreasonable, it was based on the words contained in LS3's Agreements. Under the JVOA, the Management Committee generally has "the exclusive power and authority to manage the business and affairs of the Company, including in performing the Contract." (AR 3022). The JVOA provides that "the business and affairs and the Company shall be managed by, and under the direction and control of, the Management Committee." (AR 3021). OHA's analysis was narrowly focused on language providing that the Management Committee was to manage all LS3's "businesses and affairs," except for "those matters expressly specified by this Agreement to be managed by the Managing Member or subject to the unanimous approval of the Members." (*See* AR 3402 (citing AR 3021–22)). OHA concluded that this language violated 13 C.F.R. § 125.18(b)(2)(ii)(B) because it provided SA-TECH, which holds fifty percent of the seats on the Management Committee, with the ability to block all LS3 actions should it choose to do so. (AR 3403). According to OHA, "the Management Committee has control over LS3 and its Responsible Manager, and [SA-TECH] can exert negative control over the Management Committee." (*Id.*).

---

[10] The phrase "including in performing the Contract" is not inherently problematic or dispositive based on the holding of *Defense Integrated Solutions*. 165 Fed. Cl. at 376, 378 (explaining that "the regulations even permit non-managing partners to have responsibility for managing or administering some day-to-day contractual performance," such as facility clearance matters, and explaining that "while SBA's wording of the regulation does not include broadening language (such as 'related to'), the regulation does include limiting language, such as 'day-to-day' (as opposed to 'all')").

OHA also narrowed its focus to the Management Committee's control of Project Manager, Mr. VanDerWerff. Section 5.2.1 of the JVOA states that "[t]he Managing Member [LULKAYVA] shall appoint one of its employees to act as the Project Manager [Mr. VanDerWerff] to work on behalf of the Company, as specified in the Joint Venture Agreement, upon such terms and conditions as it deems appropriate." (AR 3023). The same section also states that "[t]he Project Manager shall serve at the pleasure of the Managing Member and may be removed at any time, with or without cause." (*Id.*). "Without limiting the generality of the foregoing, the Project Manager shall be responsible for the Company's performance of its day-to-day responsibilities under the Contract." (*Id.*). LS3 would have the Court look no further than these provisions, but contracts should be interpreted as a whole.

LS3 claims that, because the Project Manager is "responsible" for "day-to-day responsibilities," the Project Manager acts independently from the Management Committee. However, the words of the Agreements tell a different story: the next section—JVOA Section 5.2.2—states that "the Project Manager is 'subject to the direction and control of the Management Committee' and is to 'carry out the policy decisions of the Management Committee.'" (AR 3023). Policy decisions must necessarily be read separately from being the subject and control of the Management Committee. Serving at the pleasure of two entities is not novel. In fact, it is common in many industries, including among SBA entities; OHA noted that in other cases it "has held that businesses with managing directors from each member, having equal authority, do not meet the regulatory requirements of being controlled by the SDVOSB concern." (AR 3402 (citing *Seventh Dimension, LLC*, SBA No. VET-6057, 2020 WL 3411520 (2020); *HANA-JV*, SBA No. VET-227, 2012 WL 747374 (2012))). Here, while the Project Manager serves on behalf of LUKAYVA, the Project Manager also serves at the pleasure of the Managing Committee, fifty percent of which is made up of SA-TECH representatives.

The United States argues that LS3 fundamentally misunderstands the difference between performance and control. (Def.'s xMJAR at 17). "Control" by a service-disabled veteran is a critical requirement to qualify as an SDVOSB. *See generally* 13 C.F.R. § 125.13. Likewise, the SDVOSB's "control" of management and administration of contract performance is necessary to establish the joint venture's eligibility to compete for contracts set aside for SDVOSBs. *See* 13 C.F.R. § 125.18(b)(2)(ii)(A). Contrary to LS3's argument, compliance with the portion of the regulation relating to "performance" by the project manager does not mean that LS3 also complies with the requirement to establish "control" by the managing venturer, LUKAYVA. *See* 13 C.F.R. § 125.18(b)(2)(ii)(A). The Agreement thus draws a distinction between "performance" of the contract, delegated to the project manager, versus "direction and control" of such contract performance, which is assigned to the Management Committee. (*See* AR 3022–23 (assigning the Management Committee "exclusive power and authority to manage the business and affairs" of LS3, "including in performing the Contract")). By assigning the project manager responsibility for "performance," but granting the Management Committee "direction and control" of the project manager and authority to manage contract performance, (AR 3021–23), the JVOA makes clear that the Management Committee—not LUKAYVA—has "control" over the management and administration of the contract. 13 C.F.R. § 125.18(b)(2)(ii)(A). OHA's finding that SA-TECH can assert negative control over day-to-day activities and contract administration by virtue of controlling the Project Manager is not an arbitrary reading of LS3's Agreements.

11

LS3 further argues that OHA fundamentally erred by ignoring the JVA when it considered powers of the Management Committee. (Pl.'s MJAR at 26). Section 11.8 of the JVOA states that the JVOA "together with the Joint Venture Agreement, is an integrated agreement and embodies the complete agreement and understanding between the Members." (AR 3035). However, LS3 also admits that the JVOA and JVA provisions are not in conflict with one another. (Pl.'s MJAR at 29 ("The Court can read the provisions harmoniously . . . .")). The JVOA states that "[i]n the event of a conflict between a provision in this Agreement and a provision in the Joint Venture Agreement, the provision in the Joint Venture Agreement shall control." (AR 3035). While it is true that OHA was silent on provisions specific to the JVA, this is presumably because there was no argument tethered to the Agreements conflicting with one another. Again, this reading is not arbitrary or capricious, thus it cannot form a basis for reversing OHA's findings.

Words matter. For OHA, the words of joint venturers matter the most. The words LUKAYVA and SA-TECH chose were that "[d]ecisions of the Management Committee within its scope of authority shall be binding upon the Company, all Managers, the Project Manager, and each Member;" (AR 3022), and that the Project Manager is "subject to the direction and control of the Management Committee[,]" (AR 3023). Despite the activities reserved for LUKAYVA as Managing Venturer, the Agreements allocate too much control to the Management Committee—and therefore SA-TECH—specific to LS3's day-to-day activities and contract administration. As OHA reasonably explained, "the Management Committee controls the actions of the Project Manager." (AR 3402). Because the JVOA delegates substantial control over the management and administration of contract performance to the Management Committee and not enough control to LUKAYVA, OHA's reading of the JVOA and JVA was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

> ii. OHA erred finding that there was no provision for SBA regulations to control in the event of a conflict, but this error did not prejudice LS3.

LS3 further asserts that OHA arbitrarily overlooked the Agreements' provision expressly incorporating SBA's regulations and stating that those regulations take precedence over any contrary provisions in the JVOA or the JVA. [11] (AR 3035 ("In the event of a conflict between a provision in this Agreement or a provision in the Joint Venture Agreement and the SBA's regulations, the SBA's regulations shall control.")). OHA found that this provision did not exist.

---

[11] LS3 urges the Court to consider the SBA's own guidance on this. (Pl.'s MJAR at 30 ("SBA's 2018 Joint Venture Agreement Guide expressly recommended that joint venture agreements include a conflicts of law provision providing that SBA regulations control over any provision of a joint venture agreement." (citing Joint Venture Agreement Guide at 8, Ex. A)). The Court's consideration of this document is improper. LS3 makes no effort to supplement the Administrative Record with this document. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)) (explaining that supplementing the administrative record "should be limited to cases in which the omission of extra-record evidence precludes effective judicial review") (internal quotations omitted). Likewise, LS3 has also failed to show that it advanced this same argument before OHA.

(AR 3403 ("[] I cannot find in the JVA or JVOA any provision which incorporates SBA's regulations into the agreements, so that if there is any conflict with the SBA regulations, the regulations control.")). This is clearly an incorrect finding. However, LS3 cannot show it was significantly prejudiced from this error. *See Bannum*, 404 F.3d at 1353 (citations omitted) (to show prejudice, the protester is required to show a "substantial chance" the protester "would have received the contract award but for the errors").

Awardee and intervening defendant, NDTI, makes a policy-based argument, stating that if the addition of "boiler-plate provisions" is all that is required to be considered fully in compliance with the SBA regulations, then companies could enter into wholly non-compliant agreements and point to those "magic words" as an out for operating under materially non-compliant governing documents. (Int.-Def.'s xMJAR at 14). Thus, as NDTI argues, "it cannot be dispositive in determining whether a joint venture operates in accordance with 13 C.F.R. § 125.18(b)(2)(ii)(A)." This is a bold proposal the Court declines to accept in full, but the general premise is correct. Boilerplate provisions often lack the requisite particularity required for incorporation by reference in most contracts.

At the time LS3 submitted its final bid, "SBA regulations" encompassed forty-seven parts under the Small Business Administration chapter of the Code of Federal Regulations. *See* 13 C.F.R. §§ 101–147. By including this conflicts of law provision in its JVOA, LS3 fails to refer to specific regulations or legal requirements with the "detailed particularity" required by the Federal Circuit. *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008) (iterating that "[t]o incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents [identified].") (internal citations omitted); *see also Leeward Constr., Inc. v. United States*, 160 Fed. Cl. 446, 456 (2022). This sort of particularity is vital to both the SBA and the entities it oversees. An expectation on small businesses to be responsible for the wide range of SBA regulations, many of which do not apply, strains companies that are often already overworked and understaffed. Reflectively, such an expectation is impossible for the SBA to police. Thus, the lack of specificity and rote inclusion of "SBA Regulations" would have been fatal to LS3's claims. Because LS3's reference to SBA Regulations in its Agreements does not adequately invoke the relevant regulations, it cannot be said that OHA's error was prejudicial to LS3. This is also not a basis for reversal.

### iii. <u>OHA did not err when it failed to remand the size protest.</u>

In its status opinion, OHA determined that Mr. VanDerWerff qualified as a responsible manager under 13 C.F.R.125.18(b)(2)(ii). (AR 3401). Even with this finding, OHA dismissed LS3's size appeals as moot for lack of a case or controversy. (AR 2680–85). OHA reasoned that, because it did not qualify as an SDVOSB on other grounds, LS3 was ineligible for award. (AR 2685). LS3 argues that this was in error because "[n]o basis exists for OHA to conclude that a case or controversy no longer existed, and OHA should have either reversed the Area Office size determinations or . . . vacated the size determinations." (Pl.'s MJAR at 31). The Court declines to rule that the agency misapplied its own rules and practices.

Just as "courts have the inherent authority to adopt procedures to manage their own affairs . . . [s]o do administrative agencies." *Royal Brush Mfg., Inc. v. United States*, 75 F.4th

1250, 1261 (Fed. Cir. 2023) (citing *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016)). Under such inherent authority to develop procedures governing its adjudication of cases, OHA promulgated rules of practice stating that, in size appeals, the deciding judge "will not decide substantive issues raised for the first time on appeal, or which have been abandoned or become moot." 13 C.F.R. § 134.316(c). Applying that regulation to this case, OHA explained that the parallel status protest already found LS3's joint venture "ineligible for the subject procurement, [for] failing to comply with 13 C.F.R. § 125.18(b)(2)(ii), the same regulatory provision at issue" in the size protest. (AR 2685). Further, the parallel status protest involved "the same Solicitation No. N6893620R0120, the same challenged concern, Appellant [LS3], and the same issues, i.e., Appellant's [joint venture]." (AR 2684–85). Based on its regulation and prior decisions, OHA explained that it could not "adjudicate matters that have become moot." (AR 2685 (citing 13 C.F.R. § 134.316(c))). OHA is perfectly capable of implementing its own procedures. Further, the continuation of a "case or controversy" cannot be created simply by furthering appeal. There is no basis to disturb OHA's decision as to this.

Even if this were in error, LS3 cannot show that it would be prejudiced. This is because LS3 was already found to be ineligible for the Navy procurement at issue and, as OHA stated, "[a] finding of ineligibility is limited to that contract . . . ." (AR 3401 (citing 13 C.F.R. § 134.1003(d))). Because the Area Office's findings and OHA's apparent disagreement cannot affect future SDVOSB contracts, there can necessarily be no prejudice to LS3.

### III. Conclusion

In this case, OHA reasonably interpreted the evidence before it in applying Section 125.18(b)(2)(ii)(A). (*See* AR 3402 (assessing whether the terms of the JVOA comply with section 125.18(b)(2)(ii)(A))). LS3 has not demonstrated that such an interpretation is unreasonable or that a basis exists to disturb its findings. Thus, LS3's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 20), is **DENIED**. The United States and Intervenor-Defendant's Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 22; Int.-Def.'s xMJAR, ECF No. 21), are **GRANTED**.

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion by December 14, 2023 to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge